# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0635
Filed July 8, 2026

———————————

**In re the Detention of Jaleel Lamont Todd,**

**Jaleel Lamont Todd,**
Respondent-Appellant.

———————————

Appeal from the Iowa District Court for Black Hawk County,
The Honorable David F. Staudt, Judge.

———————————

**AFFIRMED**

———————————

Trevor J. Andersen, Assistant Public Defender, Special Defense Unit,
Des Moines, attorney for appellant.

Brenna Bird, Attorney General, and Anagha Dixit (until withdrawal), and
Nicholas E. Siefert, Assistant Attorneys General,
attorneys for appellee State.

———————————

Considered without oral argument
by Tabor, C.J., and Badding and Langholz, JJ.
Opinion by Badding, J.

**BADDING, Judge.**

On appeal from his commitment as a sexually violent predator under Iowa Code chapter 229A (2024), Jaleel Todd challenges the sufficiency of the evidence supporting the district court's finding that he "suffers from a mental abnormality" that makes him "likely to engage in predatory acts constituting sexually violent offenses if not confined in a secure facility." We affirm.

## I.     Background Facts and Proceedings

When Todd was fifteen years old, he was adjudicated delinquent for second-degree sexual abuse of his nine-year-old cousin. Todd was placed in the state training school, where he failed to complete sex offender treatment and was described as "disruptive and disobedient."

After his discharge, Todd was convicted of possession of marijuana with intent to deliver in 2010. He was placed on probation, which he soon violated. Over the next six years, Todd had three convictions for failing to register as a sex offender. He was also convicted of public intoxication and had parole violations. And he failed to complete sex offender treatment in 2011 and 2016. During this time, Todd described himself as living a "partying lifestyle." He estimated that he had around 150 casual sexual encounters with women, most of which involved drugs or alcohol.

In 2018, Todd was at a house party with his girlfriend. On his way out of a bathroom in a darkened bedroom, he encountered a fourteen-year-old girl lying on a mattress on the floor. Todd laid down next to her and touched her leg. Then he tried to pull her shirt up to touch her breasts. The girl got up to leave, but Todd grabbed her shirt. She freed herself, found her father, and told him what happened. When confronted by the girl's father, Todd

insisted that he did not know she was a minor. He pled guilty to assault with intent to commit sexual abuse and was sentenced to prison.

While in prison, Todd completed sex offender treatment and became a mentor to other offenders. But he also authored sexually explicit and violent books while incarcerated. One book was about a gang of women who used sex to commit robberies and murders. Another told the story of a struggling college student who was "offered some money by a frat to come strip for them." At the end of the story, the girl is given two shots of tequila and is stumbling in a crowd of men, with the suggestion that she is about to be raped. Todd also developed plans for businesses that he wanted to start after his release. Those plans included ideas like "Fantasy Fotos," where inmates could order photos of women in lingerie, and "Rotten World Entertainment," a business that would promote parties with "Jell-O wrestling strippers," "twerk fests," wet t-shirt contests, sexy Disney characters, and a "strip-a-palooza."

As Todd's discharge date approached, the State petitioned to have him committed as a sexually violent predator under Iowa Code chapter 229A. At a bench trial in December 2024, each side presented evidence from licensed psychologists with experience in evaluating sexually violent predators. The State called Dr. Gangaw Zaw, while Todd called Dr. Luis Rosell. Dr. Zaw diagnosed Todd with antisocial personality disorder and alcohol use disorder. Dr. Rosell agreed with those diagnoses. But from there, the experts parted ways. Dr. Zaw testified that Todd had a mental abnormality that made him "more likely than not to commit future sexually violent offenses if he is not confined in a secure facility." Dr. Rosell disagreed, focusing on Todd's completion of sex offender treatment and positive behavioral changes while in prison. He also challenged Dr. Zaw's risk assessment methodology.

After considering all the evidence, the district court agreed with Dr. Zaw's opinion and found the State had proven beyond a reasonable doubt that Todd was a sexually violent predator. The court granted the State's petition and ordered Todd to be committed under Iowa Code section 229A.7(5)(b). Todd appeals, challenging the sufficiency of the evidence supporting that decision.

## II.    Standard of Review

We review challenges to the sufficiency of evidence for the corrections of error at law. *In re Det. of Swanson*, 668 N.W.2d 570, 574 (Iowa 2003). The district court's findings are binding on us if they

> are supported by substantial evidence upon which a "rational trier of fact could conceivably find the defendant is a sexually violent predator beyond a reasonable doubt." To determine whether the evidence was substantial, we consider the entirety of the evidence presented in a "light most favorable to the State, including all legitimate inferences and presumptions which may be fairly and reasonably deduced from the record." Evidence is not substantial if it raises only suspicion, speculation, or conjecture.

*Id.* (cleaned up).

## III.    Analysis

To succeed on its petition to civilly commit Todd, the State was required to prove beyond a reasonable doubt that he is a sexually violent predator. Iowa Code § 229A.7(5)(a); *In re Det. of Pierce*, 748 N.W.2d 509, 512 (Iowa 2008). A person is a sexually violent predator if the person (1) "has been convicted of a sexually violent offense"; (2) "suffers from a mental abnormality"; and (3) the mental abnormality makes the person "more likely than not to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility." *Pierce*, 748 N.W.2d at 512; *see also* Iowa Code

§ 229A.2(15) (defining "sexually violent predator"). Todd contests the State's proof of the second and third elements.

For the second element, Iowa Code section 229A.2(8) defines a "mental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity of a person and predisposing that person to commit sexually violent offenses to a degree which would constitute a menace to the health and safety of others." To prove such a condition exists, the State must show Todd has "a serious difficulty in controlling" his dangerous behavior. *In re Det. of Barnes*, 658 N.W.2d 98, 101 (Iowa 2003).

Both experts diagnosed Todd with antisocial personality disorder and alcohol use disorder, but they disagreed on whether those conditions rose to the level of a mental abnormality.[1] Dr. Rosell testified that antisocial personality disorder is common in the prison population. But he noted that while seventy to eighty percent of all incarcerated individuals meet the criteria for the disorder, not all have a mental abnormality as defined by section 229A.2(8). He believed that Todd was among those with the condition who did not suffer a mental abnormality, pointing to his positive behavioral changes while incarcerated and completion of sex offender treatment. He also noted that Todd did "not exhibit recurrent, chronic sexual offending behavior," given that he only had two victims, which "is less than the average sexual offender."

---

[1] The district court incorrectly stated that "[b]oth experts agree that the respondent suffers from a mental abnormality." Despite that incorrect statement, the court's ultimate factual finding on that issue remains binding on us if it is supported by substantial evidence in the record. *See Swanson*, 668 N.W.2d at 574 (reciting the standards for sufficiency-of-the-evidence review); *see also State v. Hawkins*, 27 N.W.3d 562, 567–68 (Iowa 2025) (stating the district court's findings of fact in a bench trial "have the effect of a special verdict" and are "binding on us if supported by substantial evidence").

Dr. Zaw agreed that "just because someone has antisocial personality disorder, that doesn't necessarily mean" that person has a mental abnormality. But in Todd's case, according to Dr. Zaw, his condition did rise to that level. She relied in part on Todd's long-held beliefs that all women are liars and "objects to use for his sexual desires," which she found predisposed "him to sexually violent offenses involving non-consent victims" and impaired "his ability to control his sexual urges with any woman, regardless of age."

Dr. Zaw explained in her testimony that

the predisposition comes from the volitional impairment from the initial sex offense at 15, being treated, and then coming out in the community, living the same lifestyle, doing the same thing, disregarding and then re-offending, so . . . that volitional impairment is there. But in his case it wasn't just the two sexual offenses. It's also that underlying belief about women, objectification of women, the belief that they are used for sex and also the hypersexuality. The amount of casual sexual relationships and the behavior in the sexual offending to me has a[n] . . . underlying nonconsent sexual interest in it.

She expanded on this in her report, where she stated Todd

showed sexual preoccupation and has also been with over 150 sexual partners in his life—with more than 70 being one-night stands. His statement that he believed intoxicated people could have sex and that he would lie about how he felt about the women to persuade them into sex suggests he is hypersexual. Hypersexuality is not necessarily indicative of violent sexual offending. However, the first sexual offense . . . showed substantial violence, and the most recent offense indicates his sexual needs do not have a boundary. The victim was only 14 years old, and he had his girlfriend available for sex if he needed sex—but he did not control his impulse. His lack of control indicates he would act on his sexual impulses even with a teen girl who is unable to consent to sex. During our interview, he stated that his impulsivity and proneness to boredom could lead him back to the irresponsible lifestyle he led and acknowledged how this may be continued risks for him. Mr. Todd shows volitional impairment as he

reoffended despite a prior conviction for a sexual offense. Emotional impairment is evident in his inability to appreciate how his behaviors cause harm.

Viewing this evidence in the light most favorable to the State, we find substantial evidence supports the district court's conclusion that Todd suffers from a mental abnormality. *See In re Det. of Barnes*, 689 N.W.2d 455, 460–61 (Iowa 2004) (finding "ample evidence to support a finding that the antisocial personality disorder caused" the respondent "serious difficulty controlling his behavior").

Having found sufficient evidence of a mental abnormality, we turn to the third element: whether that condition made Todd more likely than not to engage in predatory acts constituting sexually violent offenses if not confined. Todd again relies on Dr. Rosell's opinion, which identified completion of sex offender treatment as a significant protective factor. According to Todd, Dr. Zaw failed to give him enough credit for that factor in her actuarial risk assessments. *See Pierce*, 748 N.W.2d at 513 ("An actuarial assessment provides an 'empirically measured rate of recidivism among a group of sex offenders who share a set of characteristics with the subject of the evaluation.'" (citation omitted)). The record, however, shows that Dr. Zaw did factor Todd's treatment completion into her risk assessment.

Dr. Zaw used two actuarial instruments—the Static-99R and the VRS-SO—to determine Todd's lifetime recidivism risk. She explained that "when we are doing risk assessment on sex offending, we have to look at the static risk factors which are unchanging, historical." But because the static factors considered in the Static-99R are "not really personalized," Dr. Zaw explained that individualized dynamic risk factors must also be considered. Those dynamic factors are accounted for in the VRS-SO instrument used by Dr. Zaw, which considers sexual deviance, criminality, and—undercutting Todd's argument on appeal—treatment responsivity.

7

Dr. Zaw scored Todd at a six on the Static-99R, placing him in the "well above average risk" category—the highest available under the instrument. And on the VRS-SO, she scored Todd at a thirty-seven out of a possible score of fifty-four. Dr. Zaw combined those two scores to project a lifetime recidivism risk estimate of 52% for Todd. She testified these results coincided with her professional judgment that—absent confinement in a secure facility—Todd would more likely than not commit further sexually violent offenses. Dr. Zaw explained that her overall clinical impression of Todd was that he did not have "a good grasp of his hypersexual needs" and that he had not "really aged out of the impulsivity." She noted that Todd still had the urge to live a "partying lifestyle," which he identified as his biggest risk factor. Dr. Zaw pointed to the business plans and stories that Todd created while incarcerated as evidence that "his risk factors remain active and current despite treatment."

Dr. Rosell also scored Todd at a six on the Static-99R instrument, but unlike Dr. Zaw, he used the Stable-2007 instrument to account for Todd's dynamic factors. Todd's score on that instrument was thirteen, which, when combined with the Static-99R, still placed him in the "well above average risk range." Based on these assessments, Dr. Rosell calculated Todd's five-year recidivism rate at 27%. He criticized Dr. Zaw's lifetime recidivism estimate for Todd, noting those projections "are based on very small samples" and do not account for Todd's risk decreasing every year if he doesn't reoffend. Additionally, he testified the actuarial assessments have only "moderate predictive accuracy at best." Dr. Rosell also gave more weight to Todd's completion of sex offender treatment than Dr. Zaw did. And he found Todd had other protective factors that lowered his recidivism risk, including his acceptance of responsibility for his past offenses and "minimal sexual offending history."

The district court addressed these differences between the experts, finding:

> Dr. Rosell believes there are studies that reveal that the risk assessment tools may not be as accurate as portrayed by Dr. Zaw. The Court can only conclude that the results are accurate as it appears the Static-99R and VRS-SO risk assessments are the industry standard and have been for years. The risk assessment tools have been revised over the years to reflect new studies. The current version[s] of the risk assessment tools remain the industry standard.
>
> The Court further concludes that Dr. Zaw's analysis of the respondent's behaviors and writings also reflect a likelihood to reoffend. Dr. Rosell believed that because the respondent had completed sex offender treatment program and had not reoffended while in custody, that he was doing well and that his recidivism rate would be less than predicted by Dr. Zaw. Dr. Zaw took into account the defendant's intent concerning his writings. It is difficult to believe that he has successfully completed the sex offender treatment program and continues to write stories with current fantasies involving sex with an unconscious person, objectification of women, sexual preoccupation and violent and criminal fantasies.

The court also agreed with Dr. Zaw that Todd had yet to address his alcohol use disorder, which was a recidivism risk factor for him:

> [Todd] does not describe his desire to establish a disciplined repetitive schedule in which he can maintain sobriety and continue his treatment for his sexual desires. The respondent rather describes a situation in which he wishes to become involved in the planning of large parties/events which will in all likelihood involve the use of alcohol by the participants. The respondent admits that he could be subject to recidivism if he continues to party and/or consume alcohol and marijuana. The respondent further describes various potential businesses that involve a sexual nature and basis for their existence.

In sum, the district court found that Todd

> failed to adequately address his sexual proclivities and concerns even after having completed the sex offender treatment program. Although the respondent participated satisfactorily in the sex offender treatment

program, he may well have been "faking it to make it." The respondent is relatively intellectual, has adequate social skills. He is able to present well in various situations; however, it does appear he has failed to understand the depths of his sexual risk to offend.

With those findings, the court credited Dr. Zaw's lifetime recidivism risk estimate of 52% for Todd, finding the "more likely than not standard has been met even in the face of the defendant completing the sex offender treatment program while incarcerated."

"Because this issue essentially turned on a judgment of credibility between two experts with different opinions, we give weight to the district court's judgment." *Barnes*, 689 N.W.2d at 461; *accord In re Det. of Hennings*, 744 N.W.2d 333, 340 (Iowa 2008) (noting the fact finder "was free to reject the testimony" of a respondent's expert witnesses and instead accept the testimony of the State's expert witness). That judgment is supported by substantial evidence in the record.

For these reasons, we affirm the district court's order finding that Todd is a sexually violent predator.

**AFFIRMED.**